**ANDRX PHARMACEUTICALS, INC., Plaintiff,**

**v.**

**Michael A. FRIEDMAN, Lead Deputy Commissioner, Food and Drug Administration, et al., Defendants.**

**No. CIV. A. 98–0099(JPG).**

United States District Court, District of Columbia.

Jan. 6, 2000.

James Dabney Miller, Alan Roy Dial, King & Spalding, Washington, DC, for plaintiff.

Robert Eugene Pokusa, Paul, Hastings, Janofsky & Walker, L.L.P., Washington, DC, for Faulding Inc., defendant.

Richard J. Leighton, Douglas James Behr, Keller & Heckman, LLP, Washington, DC, for Biovail Corp. Intern., defendant.

Edward Anthony Figg, Rothwell, Figg, Ernst & Kurz, Washington, DC, for Mylan Pharmaceuticals, Inc., defendant.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

This matter is before the Court on **Andrx Pharmaceuticals, Inc.'s Motion to Dismiss Biovail Corporation International's Counterclaim.** For the reasons set forth below, the motion will be granted.

## I. Background

This case first came before the Court on Andrx Pharmaceuticals, Inc.'s, ("Andrx") motion for a temporary restraining order. Andrx had challenged a Food and Drug Administration ("FDA") regulation that conditioned a period of market exclusivity on the successful defense of a patent infringement action. Andrx sought an order directing the FDA to withdraw its approval of an Abbreviated New Drug Application ("ANDA"), which authorized another company, Mylan Pharmaceuticals, to market a generic version of a drug that Andrx believed it was entitled to market exclu-

sively for 180 days. This Court granted Andrx's motion for a temporary restraining order, and directed that Mylan Pharmaceuticals cease the marketing, sale, and distribution of the generic drug at issue until the specific date on which Andrx's period of exclusivity was to run. *See* Memorandum filed March 30, 1998. Subsequently, the Court of Appeals for the District of Columbia Circuit ruled in a different case raising the same issue. In that case, *Mova Pharmaceutical Corp. v. Shalala,* 329 U.S.App.D.C. 341, 140 F.3d 1060 (1998), the court invalidated the FDA regulation conditioning the 180-day period of exclusivity on the requirement that the first ANDA applicant successfully defend a patent infringement suit. In light of this Court's opinion, and that of the Court of Appeals in *Mova,* the government has conceded this issue, and the FDA has since issued new guidelines. *See* Federal Defendants' Reply to Plaintiff's Opposition to Its Motion to Dismiss [# 30]; Andrx's Statement in Support of Motion to Dismiss at 1–2. Moreover, Andrx has voluntarily dismissed its complaint against the FDA and Faulding, Inc. *See* Notice of Dismissal as to Michael A. Friedman [# 39]; Notice of Dismissal as to Faulding, Inc. [# 44]. Thus, the only remaining issues before the Court are those raised by defendant/counterclaim-plaintiff Biovail Corporation International ("Biovail").

As did the original issue before the Court, the pending matter relates to statutory and regulatory provisions governing the generic pharmaceutical industry. Only the relevant provisions will be discussed here.[1] Specifically at issue here are certain provisions among those enacted by the Hatch–Waxman Amendments in 1984, which sought to simplify the procedure for FDA approval of generic drugs and to promote the public interest in the availability of such drugs. Pursuant to the Hatch–Waxman Amendments, the original appli-

---

1. For a more thorough discussion of the statutory and regulatory provisions governing the marketing of generic drugs, see the Court of Appeals' discussion in *Mova Pharmaceutical Corp. v. Shalala,* 329 U.S.App.D.C. 341, 344–46, 140 F.3d 1060, 1063–65 (1998).

cant for FDA approval of a drug must, as had previously been required, complete a New Drug Application ("NDA"), which must include information documenting the drug's safety and effectiveness. *See Mova Pharmaceutical,* 329 U.S.App.D.C. at 344, 140 F.3d at 1063. Subsequent applicants who wish to market generic versions of the pioneer drug may file an Abbreviated New Drug Application ("ANDA"), which may rely on the safety assessments of the pioneer drug. *See id.* Among the requirements for an ANDA is that the applicant must certify that the proposed generic drug will not infringe on any patents applicable to the pioneer drug. There are four possible certifications, one of which (the so-called paragraph IV certification) certifies that the patent related to the pioneer drug "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

When an ANDA applicant makes a paragraph IV certification, the patent-holder has forty-five days within which to bring a patent infringement suit against the applicant. If the patent-holder brings such a suit, the FDA's approval of the ANDA automatically is delayed for thirty months, a period which may be extended or shortened by the court. 21 U.S.C. § 355(j)(5)(B)(iii).

The provision of the Hatch–Waxman amendments which occasioned the original claims in this case, and which is at the heart of the antitrust allegations in the counterclaims, is a provision that specifies how subsequent ANDA applications are to be treated; specifically, it is a provision which provides that subsequent ANDA applications may not be made effective until one of two trigger dates:

> If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing [sic] such a certification, the application shall

be made effective not earlier than one hundred and eighty days after—

> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv). This provision effectively permits a 180–day period of market exclusivity for the first ANDA applicant within which the applicant may market its generic drug without competition from subsequent ANDA applicants. It ensures that any subsequent ANDA applicant may not market its generic version of the pioneer drug until 180 days from the earlier of either (1) the first commercial marketing by the first ANDA applicant, or (2) a court decision in a patent infringement suit (one brought pursuant to the statute within 45 days of the first ANDA application) finding the patent to be invalid or not infringed. This provision is intended to reward the first ANDA applicant for incurring the risks of being the first on the market with a generic version of a pioneer drug. *See, e.g., Mova,* 329 U.S.App. D.C. at 356, 140 F.3d at 1075.

Andrx originated this action challenging FDA's practice of approving in certain cases subsequent ANDAs prior to the running of the 180–day period of exclusivity to which the primary ANDA applicant was entitled. Of immediate concern to Andrx was FDA's approval of an ANDA submitted by Mylan Pharmaceuticals for a generic version of Dilacor XR®. This Court granted a temporary restraining order and directed Mylan Pharmaceuticals to cease the marketing, sale, and distribution of its generic version of Dilacor XR® until the date on which Andrx's statutory period of exclusivity was to run. *See* Memorandum and Order, March 30, 1998. Subsequently, in another case, the D.C. Circuit invalidat-

ed the FDA regulation under which the agency approved Mylan Pharmaceuticals' ANDA, as well as others in similar situations, prior to the first ANDA applicant's enjoyment of the 180–day period of exclusivity. *See Mova*, 329 U.S.App. D.C. at 357, 140 F.3d at 1076 (affirming district court's decision striking down the "successful defense" requirement).

Biovail now has filed a counterclaim against Andrx, alleging antitrust violations. Biovail alleges that Andrx colluded with Hoechst Marion Roussel, Inc. ("HMRI") to delay the implementation of the 180–day period of market exclusivity, intending to restrain trade in less expensive generic drugs and nearly achieving a monopoly, in violation of Sections 1 and 2 of the Sherman Act. Biovail also alleges the common law violations of unfair competition, tortious interference with prospective advantage, and tortious interference with contact.

## BIOVAIL'S COUNTERCLAIM

Andrx was the first to seek an ANDA for approval of a generic version of Cardizem® CD ("Cardizem"), a diltiazem-based drug[2] taken for the treatment of hypertension and angina. Biovail's Counterclaim ¶¶ 10, 11. Cardizem is manufactured and marketed by HMRI.[3] Counterclaim ¶ 12. Within the time set forth by the statute, HMRI and others sued Andrx in the U.S. District Court for the Southern District of Florida, alleging patent infringement. Counterclaim ¶ 16. In the meantime, in September 1997, the FDA gave tentative approval to Andrx's ANDA. Counterclaim ¶ 17. That tentative approval would become effective, under the statute, either upon the expiration of the 30–month waiting period, or the date of a court decision in Andrx's favor, whichever came first. Counterclaim ¶ 17.

Biovail alleges that in September 1997, HMRI and Andrx entered into an agreement under which HMRI would make non-refundable payments to Andrx, in consideration of which Andrx agreed not to introduce its generic version of Cardizem when the 30–month period expired. Counterclaim ¶ 18. These quarterly payments of $10,000,000 allegedly began on July 3, 1998, the date on which the 30–month stay imposed by the statute would expire and Andrx would therefore be permitted by the FDA to introduce its generic version into commerce, and are to continue until the Florida patent case is finally concluded or certain other events occur. *Id.* Biovail alleges that this agreement was entered into for the purpose of thwarting congressional intent and with the intent to prevent generic versions of Cardizem from entering the market within the time they would otherwise do so under the Act. Counterclaim ¶ 19. The consequence of the agreement, according to Biovail's allegations, is to prolong HMRI's ability to charge artificially high prices for Cardizem and thereby to continue to reap the benefits of a substantial monopoly. Andrx benefits as a consequence of this agreement by being paid $40,000,000 per year by HMRI while not having to place its drug into competition with other generic drugs. Counterclaim ¶ 22.

### Biovail's Cardizem Product

Biovail began its development of diltiazem-based products in 1993, when it entered into a joint-development agreement with Hoechst–Roussel Pharmaceuticals, Inc. ("HRPI"), a subsidiary of Hoechst Aktiengesellschaft ("Hoechst"). Counter-

---

2. Diltiazem is a drug that "blocks the movement of calcium particles into the cells of the heart and blood vessels," thus increasing the flow of blood through the heart and thereby lowering blood pressure. Counterclaim ¶ 24.

3. According to Biovail's counterclaim, Cardem Capital L.P. ("Cardem") holds the ap-

proved NDA for Cardizem and is the assignee of three related patents for Cardizem CD. It is Biovail's understanding that Cardem holds these patents for the benefit of, or has assigned the rights under the patents to, HMRI. Counterclaim ¶ 12.

claim ¶ 31. The purpose of this agreement was to develop and market diltiazem-based drugs that would compete directly with Cardizem, then being sold by Marion Merrell Dow, Inc. ("MMD"). Counterclaim ¶ 31. The first product produced pursuant to this agreement was a once-daily form to be sold under the name Tiazac®. HRPI, relying on Biovail's expertise and technology, compiled and filed a NDA for Tiazac, which was approved by the FDA in September 1995. Counterclaim ¶ 32. MMD sued, alleging Tiazac infringed certain patents licensed by MMD from another company, Elan p.l.c. ("Elan"). Counterclaim ¶ 33. HRPI defended the action on its own behalf and on behalf of Biovail. *Id.*

During the pendency of MMD's patent infringement action, Hoechst acquired MMD and merged it into HRPI, creating HMRI. Counterclaim ¶ 34. According to Biovail, this merger effectively breached the development agreement between it and HRPI. *Id.*

Biovail sued MMD, and its affiliate Carderm, while the acquisition was pending. Counterclaim ¶ 35. That action resulted in a settlement agreement pursuant to which "Hoechst, HRPI, MMD, and Carderm agreed that they and their successors and assigns would not, at any future time, initiate any regulatory proceedings or legal actions that would interfere with Biovail's pursuit of regulatory approvals of its once-daily, extended-release diltiazem products that were and would be developed." Counterclaim ¶ 35.[4]

### Biovail's ANDA for its Generic Version of Cardizem

Biovail submitted an ANDA with a subclass IV certification to FDA for its generic form of Cardizem. Counterclaim ¶ 41. On June 19, 1997, Biovail gave the required notice to those with NDA and patent rights related to Cardizem. *Id.* No

patent infringement suit related to Biovail's generic version of Cardizem has ever been filed against Biovail. Counterclaim ¶ 42. However, in August 1997, HMRI attempted, unsuccessfully, to convince Biovail to agree to an agreement under which Biovail would postpone marketing its generic. Counterclaim ¶ 43. Subsequently, in September 1997, Andrx announced that it had entered into such an agreement with HMRI under which Andrx would postpone marketing its generic version of Cardizem. Counterclaim ¶ 44.

### Biovail's Damages

Biovail alleges in excess of $1 billion in damages. Counterclaim ¶ 55. These damages allegedly include "unnecessary and artificial costs and delay in sales due to Andrx's interference with Biovail's rights; injury to Biovail's reputation, good will, and present value, as well as to Biovail's prospective advantage." *Id.*

## II. Discussion

Andrx moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Biovail's counterclaim for failing to state a claim upon which relief may be granted, on the grounds that Biovail lacks standing to assert the alleged antitrust violations. Andrx also seeks dismissal of the remaining claims because they lack an independent basis for federal jurisdiction, as well as on the merits.

■ In order to recover for alleged violations of the antitrust laws, Biovail must establish that it has "antitrust standing," that is, it must establish that it has suffered injury by reason of action forbidden by the antitrust laws. *See* 15 U.S.C. § 15; *Indium Corp. v. Semi–Alloys, Inc.*, 781 F.2d 879, 882 (Fed.Cir.1985). In *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 534–545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983),

---

4. In December 1995, the Federal Trade Commission ("FTC"), as a condition for its not challenging the MMD–HPRI merger, issued an order under which Biovail was granted

rights that would allow it to market Tiazac and aid Biovail in its pursuit of FDA approval for extended release products. Counterclaim ¶ 36.

the Supreme Court set out a number of factors courts should consider in determining whether a plaintiff has antitrust standing. These factors include: whether there is a causal connection between the alleged injury and the antitrust violation; whether the nature of the injury is of the type the antitrust laws were meant to prevent (the "antitrust injury" requirement); the directness or indirectness of the injury; the existence of more direct victims of the alleged violation; the speculative nature of the harm; and the potential for duplicative recoveries. *See id.; Indium,* 781 F.2d at 882; *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 264 (3d Cir.1998) (listing the *Associated General* factors and characterizing them as a "the passageway through which antitrust plaintiffs must advance"). A careful consideration of these factors leads the Court to conclude that Biovail has not established the existence of antitrust standing.

### 1. *Causal Connection and the Existence of "Antitrust Injury"*

The existence of "antitrust injury" is essential to establish standing. *See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *West Penn Power,* 147 F.3d at 265 (stating that "[i]f antitrust injury is not found, further inquiry is unnecessary"). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). It is not sufficient merely to establish a causal connection;

rather, the alleged antitrust injury must be *caused by* the alleged antitrust violation; a direct link must be established. *See Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697 (stating that antitrust plaintiffs "must prove more than injury causally linked to an illegal presence in the market"); *West Penn Power,* 147 F.3d at 268.

■ Biovail fails to establish the requisite causal connection. At the time of the briefing of these motions, the FDA had not yet approved Biovail's pending ANDA relating to its generic version of Cardizem. In recent supplemental briefing, the parties have not otherwise informed the Court. Thus, even if Andrx and HMRI had not entered into the challenged agreement, Biovail would not at this time be able lawfully to market its generic version of Cardizem. Any loss in potential sales of Biovail's product, therefore, is only marginally, if at all, related to the agreement. Also, even if this Court were to invalidate the Andrx–HMRI agreement, there is no requirement that Andrx proceed to market at this time. Andrx is free to wait until the conclusion of the Florida litigation before it begins to market its generic, and indeed the statute contemplates that possibility. Under those circumstances, no generic Cardizem manufacturer could market its product until 180 days from the conclusion of the litigation, an eventuality perfectly within the scheme set forth by the Hatch–Waxman Amendments. At least some of the potential delay in the marketing of generic versions of Cardizem, then, is more directly caused by the statutory scheme than by any agreement between Andrx and HMRI.[5]

---

5. It is worth noting that in *Mova,* the Court of Appeals referred to the Andrx–HMRI agreement when it considered the consequences of following a literal reading of the Hatch–Waxman Amendments. The Court stated the potentiality that "the first applicant could even collude with the original patent-holder to prolong their litigation, and thereby keep the second applicant's drug off the market indefinitely." *Mova,* 329 U.S.App.D.C. at 353, 140 F.3d at 1072. In a footnote, the Court cited the example offered by Biovail, which filed an amicus brief in the Court of Appeals in that case. *Id.* 329 U.S.App.D.C. at 353 n. 14, 140 F.3d at 1072 n. 14. Nevertheless, the court concluded that "we are not persuaded that this third anomaly suffices to show that a literal reading of the statute leads to results manifestly inconsistent with the intent of Congress". *Id.* 329 U.S.App.D.C. at 353, 140 F.3d at 1072.

Biovail insists that it has suffered "antitrust injury", stating that "[t]he Sherman Act specifically prohibits agreements that restrain overall competition, which is what the facts show the HMRI–Andrx competition-delaying agreement to be." Biovail's Opposition at 30. This is only one part of the equation, however. Even if the Court were to determine that Andrx's actions violated the antitrust laws, this does not end the inquiry into whether *Biovail* has suffered "antitrust injury", as that concept has been defined. Biovail alleges "unnecessary and artificial costs and delay in sales" as well as "damages to [its] prospective advantage" because of its inability to compete. However, Biovail's allegations that it has been unable to compete in the generic Cardizem market does not flow from the allegedly unlawful agreement between Andrx and HMRI. The reason Biovail cannot enter the market is because of the existence of a troublesome statutory scheme that prohibits it from marketing a drug until the first ANDA recipient goes to market, and which places no restrictions on when, or even whether, that applicant must to go to market. Indeed, Biovail has not even obtained the regulatory approval to proceed to market, thus it is barred from selling its generic drug irrespective of the Andrx–HMRI agreement. Under these circumstances, the Court cannot find that Biovail can establish that it has suffered "antitrust injury". *Cf. West Penn Power*, 147 F.3d at 268 ("Here, the interposition of the regulatory scheme and actions of the parties . . . interferes with the chain of causation. The statutory scheme precluded competition without the requisite regulatory permission. As Professors Areeda & Hovenkamp describe, 'a plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event.'") (citation omitted).

The existence of alternative trigger dates under that statute further supports a finding that Biovail's alleged injury does not flow directly from Andrx's alleged antitrust violation. The statute's second triggering date is the completion of the patent litigation—thus, the statute does provide a time at which subsequent generic competitors may proceed to market, even if the first ANDA applicant never does so. That is, 180 days from the completion of the antitrust litigation, other generics, *which have themselves received FDA approval* in the form of approved ANDAs, may proceed to market notwithstanding the action or inaction of the first ANDA applicant.

Biovail also alleges that its reputation and present value, as measured by its stock value and other criteria, have been injured by the agreement. Even if this could be proven, however, injury to Biovail's reputation is not the type of injury sought to be redressed by the antitrust laws and thus cannot provide the basis to establish antitrust standing. *Cf. Brunswick*, 429 U.S. at 488, 97 S.Ct. 697 (stating that the antitrust laws "were enacted for 'the protection of competition, not competitors'") (citation omitted).

Biovail also attempts to establish standing by asserting a right "to require compliance with those statutory provisions [contained in the Hatch–Waxman Amendments and the Sherman Act] and to prevent its protected interest from being damaged." Opposition at 28. For this proposition, Biovail cites *Bristol–Myers Squibb Co. v. Shalala*, 320 U.S.App. D.C. 32, 36, 91 F.3d 1493, 1497 (1996), which states that where "a statutory provision reflects a legislative purpose to protect a competitive interest, the protected competitor has standing to require compliance with that provision." First, that case is not an antitrust case, and nothing in that case suggests that this Court should abandon the well-developed antitrust standing inquiry. In any event, the *Bristol–Myers* inquiry does not help Biovail's attempt to establish standing. Here, the statutory provisions with which Biovail presumably seeks compliance have dual and perhaps at times competing interests—that of fostering generic drug production and marketing, as well as pro-

tecting the first ANDA applicant and in particular, one which has been sued for patent infringement by the pioneer drug's manufacturer. Moreover, it is not clear what kind of "compliance" Biovail seeks: complying with the provisions of the Hatch–Waxman amendments would not require Andrx to proceed immediately to market. Again, this demonstrates that Biovail's asserted injury, although perhaps tied to the alleged wrongdoing by Andrx, does not "flow from" that wrongdoing.

## 2. *Speculative Nature of the Harm*

■ The speculative nature of the harm is among the factors the Court is to consider in determining whether Biovail has sufficiently established the existence of antitrust standing. *See, e.g., Indium,* 781 F.2d at 882. The primary injury alleged here by Biovail—delay in sales—is speculative because there is no evidence that absent the Andrx–HMRI agreement, Biovail would be marketing its generic drug. There is the possibility that Andrx would not have gone to market even absent the agreement with HMRI, and certainly the Hatch–Waxman amendments would permit and protect that delay until the conclusion of the patent litigation. Even if there is a question of fact regarding *whether* Andrx would have proceeded to market notwithstanding the agreement, there is no indication *when* Andrx might have done so. Most importantly, damages are speculative because *even today,* Biovail *could not go to market with a generic version of Cardizem,* because it has not received FDA approval. *Cf. West Penn Power,* 147 F.3d at 268 (finding the alleged injury to be speculative where it would be difficult to measure and "because the injury claimed may never occur"); *see also Associated General,* 459 U.S. at 542, 103 S.Ct. at 911 (noting damages were "highly speculative" where the effects were indirect and may have been produced by independent factors). The Andrx–HMRI agreement, even if potentially an impediment to Biovail's entry into the relevant generic market, is not the only such impediment, and not the most direct.

## 3. *Potential for Duplicative Recoveries*

In determining whether a party has antitrust standing, one of the concerns is whether the that party is a proper party to bring a private antitrust action. *See Associated General,* 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. The Court must ask whether there exist more direct victims of the alleged antitrust violations, and whether there is a potential for duplicative recovery or complex apportionment of damages. *See Id.* at 544, 103 S.Ct. at 911; *West Penn Power,* 147 F.3d at 264; *Indium,* 781 F.2d at 882. This factor also causes the Court concern in this case. First, there clearly are other, more direct victims of Andrx's alleged violation. If Andrx's activity violates the antitrust laws, it is because it is keeping others out of the market and thereby maintaining artificially high costs for generic drugs. *See, e.g.,* Biovail's Opp. at 12–13. Those most directly affected by such a violation would be the consumers forced to pay artificially high prices for Cardizem. Also more directly affected than Biovail would be any potential competitor that has obtained FDA approval and thus would be ready and able to enter the generic market as soon as any period of exclusivity for Andrx expired.

There also is the potential here for duplicative recoveries and inconsistent holdings. Biovail currently is proceeding in another district against HMRI and others alleging various antitrust and other allegations. *See Biovail Corp. v. Hoechst Aktiengesellschaft,* 49 F.Supp.2d 750 (D.N.J. 1999). Among the facts in support of the alleged violations, Biovail has offered the Andrx–HMRI agreement. *See id.* at 766. Only recently, that court denied a motion to dismiss. Thus, Biovail stands to recover, potentially, for alleged antitrust violations arising, in part, from the agreement that is the subject of the counterclaims now before this Court.

Also, there is currently pending before a Multi–District Litigation Panel numerous actions alleging various federal and state antitrust injuries relating to the very agreement now challenged in this Court. *See* MDL 1278, In re: Cardizem CD Antitrust Litigation, Transfer Order, June 11, 1999 (stating that "the Panel finds that the actions in this litigation involve common question of fact concerning allegations that Andrx and HMRI violated various state or federal antitrust and other statutory and common laws in connection with the sale of Cardizem Cd").

## III. Conclusion

For the reasons set forth in this memorandum, the Court concludes that Biovail lacks standing to bring the asserted antitrust violations. The Court further will dismiss, without prejudice, the remaining claims for lack of jurisdiction. An appropriate order accompanies this memorandum.