OPINION
 

 WALLS, District Judge.
 

 INTRODUCTION
 

 The court now considers the last of a series of summary judgment motions in this litigation concerning paclitaxel, a naturally-occurring compound used to treat cancer. The underlying facts are fully discussed in the court’s earlier opinions, including
 
 Bristol-Myers Squibb v. Ivax Corp. et al.
 
 (addressing Noerr-Pennington immunity), 77 F.Supp.2d 606 (D.N.J.2000), and
 
 Bristol-Myers Squibb v. Ben Venue et al.
 
 (addressing inequitable conduct counterclaims), 90 F.Supp.2d 522 (D.N.J.2000) (“Bristol Motion II”).
 

 Plaintiff Bristol-Myers Squibb (“Bristol”) moves for summary judgment on the remaining counterclaims of Zenith Gold-line, Immunex Corporation, and IVAX Corporation (collectively “IVAX”), Ben Venue, and Mylan Pharmaceuticals. All the counterclaimants assert two remaining causes of action for monopolization and attempted monopolization in violation of Section 2 of
 
 the
 
 Sherman Act (“the antitrust counterclaims”). Based on the same allegations, the IVAX parties also assert a claim for state law unfair competition. Bristol refers to this motion, which primarily addresses
 
 Walker
 
 Process-styled counterclaims, as “Bristol Motion I”.
 

 The IVAX counterclaimants, with Ben Venue and Mylan, oppose the motion.
 

 Having heard oral argument on February 14, 2000, and for the reasons stated below, the court denies the motion. DISCUSSION
 

 DISCUSSION
 

 1.
 
 The Walker Process Counterclaims
 

 The Supreme Court decision of
 
 Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,
 
 382 U.S. 172, 86
 
 *542
 
 S.Ct. 347, 15 L.Ed.2d 247 (1965), established that the fraudulent procurement of a patent or the enforcement of a patent knowingly obtained by fraud on the U.S. Patent and Trademark Office (PTO) may be the basis of an action under Section 2 of the Sherman Act, provided that the other elements of a Sherman Act claim are present. 382 U.S. at 177, 177 n. 5, 86 S.Ct. 347.
 

 Relying on
 
 Walker Process,
 
 the counter-claimants accuse Bristol of monopolization and attempted monopolization in violation of Section 2. Such counterclaims are grounded on numerous, alleged misrepresentations and omissions made by Bristol during the prosecution of the patents in suit (the ’537 and ’803 patents) and a related patent (the non-asserted ’001 patent), and on Bristol’s efforts to enforce its patents through this litigation. The coun-terclaimants rely on twin theories of fraudulent procurement and fraudulent enforcement, authorized by the
 
 Walker Process
 
 decision. For ease of reference, Bristol has culled from pleadings and discovery documents some 66 misstatements and omissions charged by the defendant-counterclaimants.
 
 See
 
 Bristol Br. Exh. A.
 

 “[A]ntitrust liability under section 2 of the Sherman Act may arise when a patent has been procured by knowing and willful fraud, the patentee has market power in the relevant market, and has used its fraudulently obtained patent to restrain competition.”
 
 C.R. Bard, Inc. v. MS Systems, Inc.,
 
 157 F.3d 1340, 1367 (Fed.Cir.1998), ce
 
 rt. denied,
 
 526 U.S. 1130, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999). As noted by Bristol, the counterclaimants must pass a higher standard to survive summary judgment under their
 
 Walker Process
 
 theory than was relevant to the earlier, inequitable conduct motion. The Federal Circuit explains: “[Unequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a
 
 Walker Process
 
 counterclaim.... Inequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than ‘knowing and willful’ fraud.”
 
 Nobelpharma AB v. Implant Innovations, Inc.,
 
 141 F.3d 1059, 1069 (Fed.Cir.1998).
 

 Accordingly, to state a
 
 Walker Process
 
 claim of fraudulent procurement, counterclaimants must evidence that: 1) Bristol knowingly and willfully made a fraudulent omission or misrepresentation; 2) with clear intent to deceive the patent examiner; 3) where the misrepresentation or omission was the “efficient, inducing, and proximate cause, or the determining ground” of the issuance of the patent,
 
 ie.,
 
 “the patent would not have issued but for the misrepresentation or omission.”
 
 Id.
 
 at 1070-71.
 

 In sum, “[a] finding of
 
 Walker Process
 
 fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct. Moreover, unlike a finding of inequitable conduct, ... a finding of
 
 Walker Process
 
 fraud may not be based upon an equitable balancing of lesser degrees of materiality and intent.”
 
 Id.
 
 This distinction flows from the rationale that while inequitable conduct serves as a shield with which an alleged infringer may defend a patent infringement action by rendering a patent unenforceable, a claim of
 
 Walker Process
 
 fraud is a sword to impose antitrust liability (and treble damages) upon a patentee.
 
 Id.
 
 at 1070.
 

 In 1998, the Federal Circuit overruled its earlier precedents to declare that the issue of whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is now a question of Federal Circuit law.
 
 Nobelpharma,
 
 141 F.3d at 1068. However, the Federal Circuit continues to apply the law of the regional circuit to issues not unique to patent law, such as the determinations of relevant market, market power, and damages.
 
 Id.
 

 2.
 
 Whether the Counterclaimants Have Shown Antitrust Injury
 

 The parties first dispute whether the counterclaimants have suffered cogni
 
 *543
 
 zable antitrust injury. Section 4 of the Clayton Act, 15 U.S.C. § 15(a), grants standing to bring an antitrust action for treble damages to persons “injured in [their] business or property by reason of anything forbidden in the antitrust laws.” And, Section 16 of the Act, 15 U.S.C. § 26, provides that a plaintiff is “entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws.” The Supreme Court explains that Sections 4 and 16 provide “complementary remedies for a single set of injuries.”
 
 Cargill, Inc. v. Monfort of Colorado, Inc.,
 
 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).
 

 To justify antitrust relief, a private plaintiff must allege injury “of the type the antitrust laws were intended to prevent and that flows from that which makes defendants’ acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.”
 
 Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
 
 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The Federal Circuit has approved the following criteria to determine if a claimant possesses antitrust standing:
 

 1) whether there is a causal connection between an antitrust violation and harm to the plaintiff and the defendants intended to cause that harm;
 

 2) whether the nature of the plaintiffs alleged injury was of the type the antitrust laws were intended to forestall;
 

 3) the directness or indirectness of the asserted injury;
 

 4) whether the claim rests on some abstract or speculative measure of harm; and
 

 5) the strong interest in keeping the scope of complex antitrust trials within judicially manageable limits, avoiding both duplicative recoveries and the complex apportionment of damages.
 

 Indium Corp. of America v. Semi-Alloys, Inc.,
 
 781 F.2d 879, 882 (Fed.Cir.1985),
 
 quoting Associated General Contractors v. California State Council of Carpenters,
 
 459 U.S. 519, 537-45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The antitrust standing inquiry is not a black-letter rule, but rather a “balancing test comprised of many constant and variable factors.”
 
 City of Pittsburgh v. West Penn Power Co.,
 
 147 F.3d 256, 264-65 (3rd Cir.1998) (citation omitted).
 

 Bristol charges that the counterclaim-ants have not demonstrated antitrust injury, and have no standing to sue under the Sherman Act. The plaintiff argues that each counterclaimant is barred from marketing paclitaxel-based drugs by its failure to secure FDA approval. Absent such approval, Bristol argues, the counterclaim-ants cannot prove injury because they have not lost sales due to Bristol’s conduct.
 
 See Indium Corp. of America v. Semi-Alloys, Inc.,
 
 781 F.2d 879, 882 (Fed.Cir.1985) (finding no antitrust standing based on fraudulent patent procurement where patent challenger was not prepared to manufacture allegedly infringing product, because there was no connection between patentee’s purportedly monopolistic conduct and challenger’s alleged injury).
 

 Counterclaimants contend that their costs incurred in defense of the present infringement lawsuits are recoverable antitrust damages. They rely upon the leading Ninth Circuit decision of
 
 Handgards, Inc. v. Ethicon, Inc.,
 
 601 F.2d 986, 997 (9th Cir.1979)
 
 (Handgards I), aff'd,
 
 743 F.2d 1282, 1297 (9th Cir.1984)
 
 (Handgards II),
 
 that “[i]n a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the ... patent infringement suit are an injury which ‘flows’ from the antitrust wrong.” Likewise, the Sixth Circuit in
 
 Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,
 
 562 F.2d 365, 368 (6th Cir.1977), considered antitrust claims founded on allegations of a bad faith infringement suit. The Court reasoned that although
 
 *544
 
 the alleged infringer could not prove “direct market place damages” to its business and property, the lawsuit forced it to choose between exiting the market, buying a license from the patentee or defending the infringement action.
 
 Id.
 
 at 374. This prisoner’s dilemma established the requisite causal connection between the infringement suit and the antitrust claims:
 

 Though this court has not decided the question, other courts have held that antitrust damages may include attorney fees and costs of defending an infringement suit where the real purpose of the action is to further an existing monopoly and eliminate the alleged infringer-de-fendant as a competitor.... [0]ne who has established or is attempting to establish an illegal monopoly by fraud on the Patent Office ... should not be permitted to further this goal by means of an infringement suit.
 

 Id.; see also CVD, Inc. v. Raytheon Co.,
 
 769 F.2d 842, 857 (1st Cir.1985) (analogizing unfounded trade secrets claim to bad faith patent infringement lawsuit: “Since [the purported trade secret holder] asserted its claim in bad faith, with the intent to restrain competition, it is the type of' offense the antitrust laws are designed to prevent. The injury to [the competitor], legal expenses incurred in attempting to resolve ... bad faith claims, reflects the anticompetitive effect of acts with an anti-competitive intent.”).
 

 Under the
 
 Brunswick
 
 test, the dispute between the parties centers on whether the counterclaimants have produced evidence of antitrust injury caused by Bristol’s acts. This inquiry is complicated by the fact that Bristol brought its infringement suits under the Hatch-Waxman Act, which simplified the procedures to secure FDA approval of generic drugs and eased the statutory prerequisites to file patent infringement suits against generic manufacturers.
 
 See
 
 21 U.S.C. § 355; 35 U.S.C. § 271(e)(2) and (4);
 
 see generally Mova Pharmaceutical Corp. v. Shalala,
 
 140 F.3d 1060 (D.C.Cir.1998).
 

 Under the Hatch-Waxman Act, a generic pharmaceutical manufacturer seeking FDA approval to market a drug no longer need complete a full New Drug Application, or NDA. Instead, under 21 U.S.C. § 355(j), a generic company may file an Abbreviated New Drug Application or ANDA, which relies on the FDA’s previous findings of safety and efficacy. The applicant must include in the ANDA a certification that the proposed generic drug would not infringe existing valid patents for one of several enumerated reasons. 21 U.S.C. § 355(j)(2)(A)(vii). If the generic applicant claims that a relevant patent is invalid or will not be infringed by its product, it must so certify to the FDA, and notify the pat-entholder. 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (commonly known as a “paragraph IV certification”); 21 U.S.C. § 355(j)(2)(B)(i). The patentee then has a 45-day period within which to bring an infringement suit against the applicant. If the patentee so sues, FDA approval is delayed automatically for 30 months or until the patent in suit is declared invalid or not infringed. 21 U.S.C. § 355(j) (5) (B) (iii).
 

 Such is the case here. Upon the coun-terclaimants’ filing of ANDAs with the FDA, Bristol brought these six infringement lawsuits against the generic manufacturers, pulling the Hatch-Waxman “trigger,” 35 U.S.C. § 271(e)(2)(A) — the commencement of litigation automatically delaying FDA approval of the generics’ proposed drugs.
 

 The counterclaimants confirmed at oral argument that they have not obtained even tentative or conditional FDA approval, effective upon resolution of the infringement litigation, to market their competing pacli-taxel-based drugs.
 
 See also
 
 IVAX Statement of Material Facts 1Í1Í135-136. Thus, Bristol concludes, the cause of counter-claimants’ injuries cannot be Bristol’s alleged misconduct — instead, the generics are barred from the market by their independent failure to secure agency approval.
 

 
 *545
 
 Bristol relies on
 
 City of Pittsburgh v. West Penn Power Co.,
 
 147 F.3d 256, 269 (3rd Cir.1998), that a claimant does not possess antitrust standing when its purported injuries are caused by the “structure of the regulated industry,” and not by the actions of another party. There the Third Circuit dismissed antitrust claims as impermissibly “speculative” because the plaintiff city had not obtained regulatory permission to compete in the market. “[Tlhe City will never be able to prove a direct link between the alleged antitrust violation and their purported injury.... The injury is not only ‘speculative’ because it is difficult to measure; rather, it is speculative because the injury claimed may never occur.” 147 F.3d at 268.
 

 Bristol’s argument ignores the reality of Hatch-Waxman. There is no dispute that by suing the generic defendants under the Hatch-Waxman Act, Bristol provoked the automatic moratorium of FDA approval of the generics’ ANDAs. For Bristol to insist that its generic competitors have no standing because they are not in the market, when Bristol itself foreclosed their access to it, is meritless.
 

 That said, since the beginning of litigation, the generic manufacturers have had little practical incentive to pursue even conditional agency approval. As Ben Venue remarked at oral argument, because FDA approval would be meaningless in the absence of a favorable court ruling on infringement or validity, the generic companies are better served to direct their resources toward defense of the infringement action. Under these circumstances, the court does not accept Bristol’s premise that any lessening of competition is caused by the FDA’s refusal to approve the pending ANDAs. The court finds that there is a definite, causative link between Bristol’s induced moratorium and the counterclaim-ants’ alleged antitrust injuries.
 

 To find otherwise would ignore the prudential goals of the antitrust standing requirement. To repeat, the purpose of the standing requirement is to ensure that the courts compensate only those injuries of the type the antitrust laws were intended to prevent and that [flow] from that which makes the [complained-of] acts unlawful.”
 
 Brunswick,
 
 429 U.S. at 489, 97 S.Ct. 690. In a classic patent infringement case, a patentee may sue an alleged infringer only when the defendant “makes, uses, offers to sell, or sells” a patented invention — in other words, upon its actual entry into the market.
 
 See
 
 35 U.S.C. § 271(a). Concomitantly, doctrines of antitrust standing have evolved to require that a competitor be prepared to enter the market before bringing antitrust claims.
 
 See, e.g., Indium,
 
 781 F.2d at 882. In contrast, under the Hatch-Waxman Act, a patentee may sue a generic drug company when it submits an ANDA.
 
 See
 
 35 U.S.C. § 271(e). The purpose of this is to allow drug pat-entholders to quickly resolve competing claims in court, before their competitors make inroads into the market.
 
 See Eli Lilly & Co. v. Medtronic,
 
 496 U.S. 661, 675,' 677, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) (finding that the function of §§ 271(e)(2) and 271(e)(4) is “to define a new (and somewhat artificial) act of infringement” in order to “enable the judicial adjudication upon which the ANDA and paper NDA schemes depend.”).
 

 Were the court to accept Bristol’s position, antitrust standing under the Hatch-Waxman Act would be wholly contingent on the vagaries of the timing of agency action. If the FDA acted immediately to grant conditional approval to an ANDA, the generic applicant would have standing to bring antitrust claims. But if, as here, the patentee beat the applicant to the punch by filing a motion to dismiss before FDA approval, the generic maker would be denied antitrust standing. Such an anomalous and arbitrary result was not intended by the statute.
 

 The court rejects Bristol’s contention that the counterclaimants, subjected to a moratorium invoked by plaintiff, must be already in the market, or at least fully prepared to enter the market, to secure
 
 *546
 
 standing to bring antitrust claims. Bristol Reply Br. at 3 n. 3. That argument seeks to bind the counterclaimants to circumstances beyond their control. The plaintiffs attempts to distinguish
 
 Handgards v. Ethicon, CVD v. Raytheon,
 
 and
 
 Kearney & Trecker
 
 on that basis are rejected.
 

 Because of the novelty of the HatchWaxman provisions, this question has not often been addressed by the courts. Bristol’s reference to
 
 Andrx Pharmaceuticals, Inc. v. Friedman,
 
 83 F.Supp.2d 179 (D.D.C.2000), is misplaced: that court recited the rule of
 
 West Penn Power,
 
 147 F.3d at 268, but did not address the unique issues presented by a
 
 Walker Process
 
 counterclaim in a Hatch-Waxman setting.
 
 See
 
 83 F.Supp.2d at 184-85 (finding no antitrust injury based on a generic company’s allegations of illegal collusion because the plaintiff had not yet obtained FDA approval; reasoning that even in absence of the challenged agreement, the plaintiff would not be able to lawfully market its drug);
 
 and compare
 
 the District of New Jersey companion to the
 
 Andrx
 
 decision,
 
 Biovail Corp. Int’l v. Hoechst Aktiengensellschaft,
 
 49 F.Supp.2d 750, 772 (D.N.J. 1999) (Barry, J.) (refusing to bar antitrust claims despite lack of FDA approval, in part because the generic plaintiff sought injunctive relief).
 

 More to the point is the Southern District of New York decision of
 
 Novo Nordisk of North America v. Genentech,
 
 885 F.Supp. 522 (S.D.N.Y.1995). There the court considered
 
 Walker Process
 
 claims brought by a generic drug manufacturer which alleged that it had been subject to a “sham” proceeding before the International Trade Commission. The court rejected the patentee’s argument that, without FDA approval, the generic company lacked antitrust standing:
 

 [T]he complaint alleges as the antitrust injury the costs incurred in connection with defending a litigation in which a patentee attempts to enforce patents that are invalid and unenforceable. This is a well recognized type of antitrust injury which comprises the costs incurred in defending a “sham” litigation filed in violation of the antitrust laws.... In the patent field, this principle was established in the Handgards I and Handgards II cases.... These cases established the recoverability of damages by victims of bad faith patent infringement suits.
 

 Id.
 
 at 525.
 

 That decision comports with common sense and established caselaw. This court accepts the counterclaimants’ contention that, to invoke antitrust standing under a
 
 Walker Process
 
 theory, a Hatch-Waxman defendant subject to the moratorium need not demonstrate that the FDA has first approved its product. There being no other reason to support Bristol’s position, the court concludes that the counterclaimants have standing to bring their Sherman Act claims.
 

 3.
 
 Whether the Counterclaimants Have Produced Evidence of the Relevant Market
 

 In the alternative, Bristol claims that summary judgment is appropriate because the counterclaimants have not provided evidentiary support of the relevant product market alleged in their counterclaims. Bristol Br. at 18. “To establish monopolization or attempt to monopolize a part of trade or commerce under [Section 2] of the Sherman Act, it [is] necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [an antitrust defendant’s] ability to lessen or destroy competition.”
 
 Walker Process,
 
 382 U.S. at 177, 86 S.Ct. 347.
 

 Bristol acknowledges that Zenith Gold-line has submitted an expert report of Dr. Jeffrey A. Dubin of the Pacific Economics Group, who defines two purportedly relevant markets: first, the market for taxane drugs (a chemical group which includes
 
 *547
 
 both paclitaxcl/Taxol®/Paxene® and docetaxel/Taxotere®, manufactured by RhonePoulenc Rhorer), and second, the broader market for “antineoplastic chemotherapy agents indicated for specific therapeutic uses.” Marriott Decl. Exh. 83 at 42. Yet, Bristol now objects that this expert report does not “match” the product market alleged in the counterclaims: the narrower United States market for paclitaxel-based drugs.
 
 See, e.g.,
 
 Counterclaims of IVAX Defendants ¶ 119; Counterclaims of Mylan, Marriott Deck Exh. 82 at 15 ¶ 33.
 

 The IVAX defendants counter that Bristol’s argument is outside the “notice pleading” philosophy of the Federal Rules of Civil Procedure.
 
 See, e.g.,
 
 Fed.R.Civ.P. 8(a) (requiring only a “short and plain statement of the claim showing that the pleader is entitled to relief’). The court agrees. The relevant market element of an antitrust claim “can be determined only after a factual inquiry into the commercial realities” of the market.
 
 Eastman Kodak Co. v. Image Technical Services, Inc.,
 
 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citation omitted). With the trial proximate, the court does not accept Bristol’s attempts to preclude potentially viable claims through a “hyper-technical attack.” IVAX Br. at 1,
 

 The court is not impressed by Bristol’s claims of undue prejudice caused by Zenith Goldline’s allegedly late disclosure of the market definition. Bristol Reply Br. at 7; Bristol Statement of Material Facts lit 148-149 (“To date, counterclaimants have not pleaded any antitrust counterclaims predicated on the alleged monopolization (or attempted monopolization) of any relevant market other than a supposed market for paclitaxel-based drags.... Yet, now, after the time for discovery has closed and the issues remaining for trial have narrowed, Zenith Goldline has submitted an expert report from Dr. Jeffrey A. Dubin.”) The counterclaimants have submitted evidence that Bristol is well aware of the extent of competition between its own Taxol® product and docetaxel.
 
 See
 
 Mentlik Third Suppl. Deck Exh. II (Bristol’s January 1996 Cancer Treatment and Administration Study Marketing Research report reviewing market penetration of Taxol and stating: “Maintaining this momentum in 1996 will prove to be challenging with the launch of Taxotere.”); Exh. JJ (1995 and 1996 charts estimating Bristol’s share of the “taxane market,” comparing docetaxel and Taxol market share).
 

 Under the circumstances, and consistent with the court’s statements at oral argument, the IVAX defendants should not be confined to their preliminary suggestion that
 
 “one
 
 relevant product market is the market for paclitaxel-based drags.” IVAX Countercl. 11119 (emphasis added). Whether the counterclaimants can prove the relevant product market and Bristol’s exclusionary power in that market, as necessary to prevail on their antitrust claims, remains to be determined at trial.
 

 4.
 
 Bristol’s Alleged Misrepresentations and Omissions
 

 To a large degree, the misrepresentations and omissions alleged by the counterclaimants overlap those addressed in Bristol’s accompanying motion for summary judgment of
 
 no
 
 inequitable conduct. For example, the counterclaimants allege that Bristol failed to disclose the O’Connell article,
 
 see
 
 Bristol Br. Exh. A (Omission # 51) and the OV.9 Abstract distributed at the 1991 National Cancer Institute of Canada conference (Omission # 53), and mis-eharacterized the teachings of McGuire (Statements #8-15, 17-20, etc.) and Kris (Statements #40-47, etc.). However, the charges presented in the motions are not identical: Here counterclaimants allege that Bristol improperly failed to disclose to the PTO the 1989 National Cancer Institute Annual Report to the FDA (Omission # 52), and a Federal Register Notice of August 1, 1989 which solicited a pharmaceutical company to partner with the NCI to develop paclitaxel (Omission # 54).
 

 
 *548
 
 A.
 
 Conduct During Prosecution of the ’628, ’881, and Applications
 

 Bristol first argues that most of the alleged misrepresentations and omissions are not actionable because they were made during prosecution of the ’628, ’831, and ’404 applications, which it claims “concerned inventions different from those of the patents in suit.”
 
 See
 
 Bristol Br. Exh. A, Statements 4-38 and 59-63; Bristol Br. at 20 (“[T]he patents in suit relate to the infusion of paclitaxel over a period of about 3 hours, whereas the ’331 and ’890 applications related only to the infusion of paclitaxel over a period of 24 hours.”). Bristol asserts that the theory of “infectious unenforceability” relied on by defendants to defeat Bristol’s arguments concerning inequitable conduct is inapplicable here.
 
 See, e.g., Consolidated Aluminum Corp. v. Foseco Intern.
 
 Ltd., 910 F.2d 804 (Fed.Cir.1990). Accordingly, Bristol seeks to prune the list of actionable statements and omissions by arguing that the majority are irrelevant to the patents asserted in this litigation.
 

 The court acknowledges that a paten-tee’s alleged conduct must satisfy a higher standard of materiality to form a basis for
 
 Walker Process
 
 claims than for an inequitable conduct defense. Whereas an inequitable conduct charge may rest “on omission of a reference that would merely have been considered important to the patenta-bility of a claim of a reasonable examiner,” to prove
 
 Walker Process
 
 fraud, the coun-terclaimants must show that the ’803 or ’537 patent would not have issued “but for” the misrepresentation or omission.
 
 Nobelpharma,
 
 141 F.3d at 1070-71.
 

 Yet Bristol’s arguments on this point overreach. The patentee has not demonstrated an absence of triable facts concerning the necessary causal relation between its alleged conduct and the patents in suit. The court is mindful of the tangled and circuitous prosecution history, involving 6 divisional and continuation applications stemming from the ’628 grandparent application, which led to Bristol’s Taxol® patents.
 
 See
 
 Genealogy of Bristol Patents, Bristol Br. Exh. C. In light of such, the court finds that Bristol’s protestations that the challenged conduct relates
 
 only
 
 to non-asserted patents are conclusory and insufficient to warrant summary judgment. The ultimate resolution of whether any of these statements was the “efficient, inducing, and proximate cause, or the determining ground” of a patent in suit,
 
 see Nobelp-harma,
 
 must await trial.
 

 B.
 
 Specific Allegations of Misconduct
 

 Bristol attempts to strike each alleged misstatement and omission as “immaterial, truthful, opinion, or justifiable advocacy.” Bristol Br. at 23. Several of these items were debated in Bristol’s motion for summary judgment of no inequitable conduct.
 

 Here the court again focuses on Bristol’s admitted nondisclosure to the PTO of the OV.9 abstract which was distributed at a meeting of the National Cancer Institute of Canada in April 1991. Bristol Br. at 31; Marriott Decl. Exh. 109 at BMS849173-74. Earlier, the court determined that Bristol’s withholding of this document from the PTO was sufficient to defeat summary judgment of no inequitable conduct, and now, the court holds that it is likewise sufficient to defeat summary judgment of no fraud under
 
 Walker Process.
 
 The abstract describes the protocol for Bristol’s OV.9 study. The IVAX parties argue that it “provides a link” between the McGuire and Kris studies, and that, as a “printed publication” under 35 U.S.C. § 102(b), it completely anticipates all claims of the ’803 and ’537 patents.
 
 See
 
 IVAX Br. in Opp. to Bristol Motion II at 8. Should IVAX’s contentions prove true, Bristol’s nondisclosure of the OV.9 abstract is obviously highly material even under the heightened
 
 Walker Process
 
 “but for” standard. And IVAX has raised a triable issue concerning Bristol’s intent to defraud the PTO by submitting declarations by conference attendees that Dr. Elizabeth Eisenhauer, a named inventor of the patents in suit, was aware of the OV.9 abstract and discussed the
 
 *549
 
 OV.9 study at the conference.
 
 See
 
 Decl. of Robert Pearcey and Marc Trudeau. The counterclaimants may be able to prove at trial that Bristol acted “knowingly and willfully” to defraud the PTO; Bristol’s self-serving declarations of good faith cannot justify summary judgment at this time.
 
 See
 
 Marriott Decl. Exhs. 90 and 91;
 
 FMC Corp. v. Manitowoc Co.,
 
 835 F.2d 1411, 1416 (Fed.Cir.1987) (assessing inequitable conduct claim, ruling that “[a] mere denial of intent to mislead ... will not suffice” where there is clear proof that a patentee knew or should have known of highly material information). Summary judgment on this
 
 Walker Process
 
 motion is denied in part on the basis of Bristol’s nondisclosure of the OV.9 abstract.
 

 Because not relevant to the resolution of this motion, the court need not at this time address each additional misrepresentation and omission alleged by the counterclaim-ants: The court does not, for example, resolve the materiality of Bristol’s withholding of facts related to Bristol’s 1991 CRADA (Cooperative Research and Development Agreement) with the National Cancer Institutes (Omissions # 55, 56, and 57). Nor does the court discuss the effect of Bristol’s alleged withholding of statements to the FDA regarding the relative efficacy and toxicity of a 24-hour versus a 3-hour protocol (Omissions # 63 and 64).
 

 The court has already begun to analyze the potential legal consequences of Bristol’s alleged withholding of the best mode of carrying out its claimed inventions (Omission # 66).
 
 See Bristol-Myers Squibb Co. v. Boehringer Ingelheim Corp.,
 
 2000 WL 230218 (D.N.J. March 1, 2000) (“Best Mode Opinion”). And the court has discussed in detail the effect, under an inequitable conduct analysis, of Bristol’s alleged misrepresentations concerning the McGuire and Kris studies.
 
 See Bristol-Myers Squibb v. Ben Venue et al.,
 
 90 F.Supp.2d 522 (D.N.J.2000).
 

 The court will not now review each alleged instance of misconduct under the heightened
 
 Walker Process
 
 standard. The parties will have ample opportunity to develop these issues at trial.
 

 5.
 
 Zenith Goldline’s Unfair Competition Counterclaim
 

 Bristol also moves for summary judgment on the unfair competition counterclaim asserted by Zenith Goldline, which is founded on allegations that Bristol obtained patents through fraud and inequitable conduct and asserted invalid patents. The counterclaim defendant proceeds on the theory that, should this court dismiss the
 
 Walker Process
 
 counterclaims, it must necessarily dismiss the unfair competition counterclaims as well. Bristol Br. at 36.
 

 The court has not granted Bristol’s request for
 
 Walker Process
 
 summary judgment, and so the premise fails. Bristol’s motion for summary judgment to dismiss the unfair competition counterclaim is denied.
 

 CONCLUSION
 

 Bristol’s motion for summary judgment on the remaining counterclaims of Zenith Goldline, Immunex Corporation, and IVAX Corporation (collectively “IVAX”), Ben Venue, and Mylan Pharmaceuticals is denied.
 

 ORDER
 

 Plaintiff Bristol-Myers Squibb moves for summary judgment to dismiss the remaining counterclaims of Zenith Goldline, Immunex Corporation, and IVAX Corporation (collectively “IVAX”), Ben Venue, and Mylan Pharmaceuticals.
 

 Having heard oral argument on February 14, 2000, upon consideration of the parties’ submissions, and for the reasons stated in the accompanying opinion,
 

 It is on this day of March, 2000:
 

 ORDERED that Bristol’s motion for summary judgment to dismiss counterclaims is DENIED.